Filed 8/17/20  Jewell v. Barclays Capital Real Estate CA1/1
Reposted with correct file date

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| MARSHA LANE JEWELL,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>BARCLAYS CAPITAL REAL ESTATE, INC et al.,<br><br>      Defendants and Respondents. | A156526<br><br>(Contra Costa County<br>Super. Ct. No. CIV-MSC10-01534) |

In October 2011, appellant Marsha Lane Jewell filed a wrongful foreclosure action against respondents Barclays Capital Real Estate, Inc. doing business as HomEq Servicing (HomEq), Ocwen Loan Servicing, LLC (Ocwen), and Deutsche Bank National Trust Company (Deutsche), asserting 15 causes of action.  In December 2014, respondents prevailed on summary judgment and the case was ordered dismissed.  In a March 2016 opinion, we reversed the judgment in part and remanded for trial on her causes of action for breach of contract, unfair business practices in violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq. (UCL)), and declaratory relief.  (*Jewell v. Barclays Capital Real Estate, Inc.* (Mar. 8, 2016, A144588) [nonpub. opn.] (*Jewell I*).)  Appellant prevailed on her breach of contract and UCL claims.  On appeal, she asserts the court erred in failing to account for "wrongful double homeowner's insurance charges" when it calculated the

1

damages award.  Because substantial evidence supports the trial court's damages determination, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The following summary is taken from the evidence offered at trial.

## A.    *Background*

In December 2005, appellant took out an adjustable-rate loan for $315,000, secured by a deed of trust on her home.  Under the terms of the loan, appellant's interest rate started at 7.9 percent but could increase to 14.9 percent.  HomEq was the original loan servicer.[1]

Between March 2006 and March 2008, appellant made all of her loan payments.  Her employer went out of business in October 2007.  In March 2008, the interest rate on her loan reset to 10.9 percent, resulting in a monthly payment of over $2,800.  She could not afford the payment and contacted HomEq about a loan modification.

Appellant was told she needed to go into default for two months in order to obtain a loan modification.  Acting on that advice, she ceased paying her mortgage.  Her voluntary hazard insurance policy lapsed due to nonpayment.  Appellant testified that though she tried many times, she was unable to contact anyone at HomEq regarding the promised loan modification.  HomEq soon sent her a letter purportedly denying her application to modify her loan, even though she had not actually filed an application.  She subsequently received a notice of default.

## B.    *HomEq Purchases Hazard Insurance and Offers a Loan Modification*

When a borrower is not paying property taxes and insurance, it is common for the lender or servicer to protect the collateral by purchasing

---

[1] The loan was assigned to Deutsche in 2006  Ocwen has been servicing appellant's loan since September 2010.

2

force-placed (or hazard) insurance. HomEq was authorized to obtain hazard insurance coverage under the terms of appellant's deed of trust.

As noted above, appellant stopped paying her property insurance when she stopped making mortgage payments from March 2008 through December 2008. In May 2008, her carrier, Allied Insurance, informed HomEq that her insurance policy had been canceled for nonpayment in March 2008. HomEq obtained its own hazard insurance policy in May 2008, charging appellant's account $5,579.68 for the insurance premium.

Foreclosure was set for December 3, 2008. After appellant contacted HomEq to convey that she planned to file for Chapter 13 bankruptcy protection, HomEq agreed to modify her loan if she did not file for bankruptcy. Her loan would be revised to provide for a $1,974 monthly payment, which included $350 for estimated impound/escrow charges. To secure the offer, she wired HomEq a down payment of $8,000 and faxed requested documentation, including a document regarding a $674 December 2008–December 2009 Allied Insurance hazard policy.[2] She was told the loan had been approved but it would take a couple of months to get the contract to her because they were very busy.

The loan modification contract was prepared and delivered to appellant in February 2009. She overnighted a cashier's check for the January 2009 payment along with an executed copy of the contract. She received HomEq's countersigned contract in March 2009, dated February 13, 2009. The contract was ratified back to December 2008. The total outstanding balance on the loan was $328,580. Before modification, her balance had been

---

[2] As we describe further below, the trial court found that this document was an insurance quote, not a declaration of insurance, and there was no evidence that an Allied insurance policy was in effect in December 2008.

3

$298,272, and the principal balance was increased by unpaid interest, late charges, fees, and costs.

In March 2009 HomEq charged appellant's account for another force-placed insurance policy premium, this time in the amount of $5,617.83. The payment was advanced by HomEq. The policy covered the period March 22, 2009 to March 22, 2010. In May 2009, appellant first learned that HomEq had imposed the force-placed insurance policy. She contacted HomEq but received no explanation as to why her Allied Insurance policy had been replaced. She asked her Allied Insurance agent, Steven Hom, to intervene. Hom contacted the lender in June and August 2009 and was advised to fax the declaration page to HomEq.

In August 2009, HomEq replaced its insurance policy with an Allied policy that appellant procured through Hom. HomEq paid the Allied Insurance premium of $882 for 12 months of coverage, crediting $3,431 to her account for the cancellation of the March 2009–March 2010 force-placed insurance policy.

## C.    *HomEq Tries to Impose a Different Loan Modification*

At trial, it was revealed that HomEq made a mistake when it prepared the December 2008 loan modification agreement. HomEq inadvertently applied appellant's $8,000 down payment to three of her past-due payments before the actual loan terms were calculated. Compounding the error, HomEq's loan system assumed the existence of a $8,000 down payment. The errors resulted in an unintended write down of approximately $16,000 of appellant's debt. In March 2009, following an internal review, the December 2008 loan modification agreement was rejected by HomEq's loan maintenance department. By then, a HomEq representative had already countersigned the December 2008 contract.

4

In June 2009, appellant received a call from another HomEq employee who said she needed to sign a loan modification agreement immediately to avoid foreclosure. When she replied that she already signed an agreement, the representative stated they did not have record of any loan modification. Appellant offered to send a copy of the signed agreement. He said the new agreement was better for her because it had a lower interest rate, and he faxed her a copy.

The new agreement did not reference the December 2008 loan modification. It included $63,000 in unexplained capitalized charges. The new agreement also reflected that appellant had not made any payments since March 2008, when appellant had advanced $18,000 in payments under the December 2008 loan modification agreement. Appellant decided to keep the contract she already had.

### D.	*HomEq Refuses to Perform Under the December 2008 Loan Modification Agreement*

Appellant made monthly payments to HomEq pursuant to the December 2008 loan modification agreement. HomEq returned her checks and demanded cashier's checks instead. In August 2009, she received a letter stating she would be foreclosed upon if she did not pay $31,988. In October 2009, her monthly payment was rejected and she was told HomEq would not accept any further payments except for payments to reinstate her loan, even though she was not in default on the December 2008 loan modification agreement.

In January 2010, a notice of trustee's sale was issued. Appellant filed a complaint and obtained a lis pendens and a temporary restraining order. The following day, her home was sold. Appellant was subsequently served with a three-day notice to quit. The sale was later rescinded.

5

### E.    Trial Court Findings and Judgment

Following remand after our decision in *Jewell I,* appellant's causes of action for breach of contract, violation of the UCL, and declaratory relief were tried in a bench trial spanning several days starting in March 2018.

One of appellant's objectives at trial was to show she had been unfairly charged for force-placed insurance.  Appellant sought to prove that she had provided evidence of insurance to HomEq concerning a $674 Allied Insurance policy in December 2008.  The trial judge asked:  "Do you have a copy that you are going to enter into evidence of what you faxed to them?"  Appellant answered that she did have a copy; however, she produced a copy of an insurance quote, not a declarations page.  The two-page document stated that a total premium of $674 would be charged for insurance coverage from December 2008 to December 2009.  The court noted that the second page of the document states under "special notes" that "[t]his quote is not a binder of insurance."  The court concluded the exhibit showed "that the policy is not necessarily in effect.  It's that the quote you got from the insurance person who said, if you were to purchase this policy, this is what the coverages would be and how much it would cost."

On November 7, 2018, the trial court filed its statement of decision.  It determined that HomEq had breached the December 2008 loan modification agreement and violated the UCL.  The court ordered $139,197 in interest charges to be deducted from the current loan balance, representing the interest incurred from the time HomEq stopped accepting appellant's mortgage payments in October 2009.  The court concluded appellant was not entitled to any reduction attributable to HomEq's purchase of hazard insurance.  Judgment was entered on January 29, 2019.  This appeal followed.

6

## DISCUSSION

### I. *Standard of Review*

Appellant's appeal is directed to her claim that she is entitled to a credit on her loan balance for $8,235 in force-placed insurance premiums she asserts HomEq improperly charged to her account. The amount of damages is a factual question and " ' "an award of damages will not be disturbed if it is supported by substantial evidence." ' " (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1324.) "The burden of demonstrating error rests on the appellant." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) We view the evidence most favorably to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) When two or more inferences can be reasonably deduced from the facts, we must accept the deductions of the trial court. (*Estate of Teel* (1944) 25 Cal.2d 520, 526.)

### II. *Substantial Evidence Supports the Trial Court's Finding That Appellant Had Not Acquired Hazard Insurance in December 2008*

Appellant asserts the trial court should have offset a portion of the premiums for the force-placed policies that HomEq purchased in May 2008 and March 2009 because she secured hazard insurance with Allied Insurance in December 2008. She contends the trial court had a "misconception that Jewell failed to obtain a homeowners insurance policy in December 2008, when the trial evidence and testimony prove she had indeed secured a policy." We conclude substantial evidence supports the lower court's determination that proof of insurance had not been submitted to HomEq in December 2008.

In its statement of decision, the trial court explained why it declined to include a credit for the force-placed insurance policy premiums in its damages calculation: "One of [the] documents that was required to be submitted by Plaintiff during this process was the declarations page of her current homeowner's insurance policy. Instead of a declarations page, Plaintiff submitted a quote from Steven Hom Insurance Services for a new policy that would be issued by Allied Insurance with a yearly premium of $674." The court concluded this evidence was insufficient to show that a policy existed or that HomEq had a duty to purchase an Allied Insurance policy on her behalf.

Appellant does not dispute that an actual copy of a December 2008 Allied Insurance policy or insurance declaration was never produced at trial, and she appears to concede that no such record presently exists. She instead argues that other evidence demonstrates that proof of insurance was submitted to HomEq. For example, appellant points to an entry in HomEq's communication log dated December 8, 2008 that states: "MHAZ Modification HAZ Declaration Page has been imaged." Appellant claims this entry proves that the policy's declarations page was received and imaged. However, former HomEq employee Jacqueline Cartmill testified that the entry "is a standard comment in haz modification. Declaration page is a standard—in other words, it's not a free form but input into the system." She explained the entry's content cannot be customized: "It's a standard comment that's entered into the system. In other words, there's no differentiation between what type of—it has to do with hazard insurance and that's all." Accordingly, Cartmill was unable to verify whether the entry referred to a declaration page or to an insurance quote. The trial court apparently gave little weight to this one-line entry in the communications log, and while such evidence

8

may be subject to differing interpretations by the factfinder, we are not at liberty to reweigh the evidence and arrive at a different conclusion.

Appellant also relies on certain entries in HomEq's communication log that document calls made by her agent Steven Hom in June 2009 and August 2009, during which she claims Hom requested payment for the policy. The entries reflect that Hom made a request for payment and was advised to fax a new policy and declarations. These entries do not establish that an actual policy was in force. Nor does the communications log reflect that Hom contacted HomEq in December 2008 regarding a proposed policy.

Moreover, when the trial court asked appellant if any payments had been made on an Alliance policy between December 2008 and August 2009, she offered an exhibit that she claimed showed Allied Insurance had been paid $674. The exhibit is a transmittal from Allied Insurance regarding the August 2009–August 2010 policy showing a $201 credit on her premium. In her testimony, however, she was unable to show who, if anyone, had paid for the policy. She initially stated that she assumed respondents had made the payment from which the credit was derived, but then stated that perhaps she did. Again, this evidence does not substantiate that HomEq received proof of insurance in December 2008.

Appellant next contends that if she had not secured an insurance policy in December 2008, "HomEq would have sent her a letter advising her that the [loan] modification required it," and she emphasizes that such a letter does not exist. It is true that the December 2008 loan modification agreement provided that a certain amount of appellant's mortgage payment would be held in an escrow account. However, as respondents correctly observe, the agreement contains no terms creating a duty on behalf of HomEq to pay for a specific policy or to arrange for the least expensive

insurance.  Under the deed of trust, HomEq was authorized to purchase force-placed insurance when no coverage existed, and it did so.  The absence of an advisory letter is not proof that appellant did, in fact, secure an actual policy.

We must defer to a trial court's factual determinations so long as substantial evidence supports the conclusion.  (*People v. $497,590 United States Currency* (1997) 58 Cal.App.4th 145, 152–153.)  Here, there was no credible evidence that appellant provided a declaration page to HomEq prior to August 2009.  Rather, the evidence discloses that her agent contacted HomEq in August 2009 to provide proof of insurance, and that HomEq cancelled the lender-placed insurance and credited her a prorated amount of $3,431 for the insurance it had purchased.

Appellant also complains that HomEq charged her for a force-placed insurance policy effective May 2008 through May 2009, and then charged her again on March 22, 2009, creating "overlapping" policy charges.  However, there is no evidence in the record concerning the dates of coverage for the May 2008 lender-placed insurance policy.  Respondents posit that the lender-placed insurance policy might have been back-dated to March 2008 or might have terminated in March 2009.  Whether or not that is the case, appellant has not carried her burden of demonstrating overlap between the two insurance policies and therefore any error in the calculation of damages.

Finally, appellant points to at least two additional instances in 2010-2011 and 2015-2016, where she claims HomEq failed to credit her for other force-placed policies.  Respondents contend that appellant let her insurance lapse again, resulting in additional charges for lender-placed insurance.  We conclude this claim is not properly before us. Appellant did not allege in her complaint that she disputed any charges apart from those

resulting from the lender-placed insurance purchased by HomEq in March 2009. Nor did she seek to amend her complaint at trial. Accordingly, any claim to damages for post-2010 excessive insurance premiums has been forfeited.[3] (*Castaic Clay Manufacturing Co. v. Dedes* (1987) 195 Cal.App.3d 444, 449 ["It is the general rule that, in a contested cause, in the absence of an amendment to the complaint to conform to proof, a court may not award the plaintiff a sum in excess of the amount of damages he claims to have sustained."].)

## III.   *Attorney Fees*

Appellant asserts she is entitled to approximately $30,000 in attorney fees and court costs that she was forced to expend fighting respondents' breaches and foreclosure over the years. Appellant represented herself during the trial, and at no point did she file a motion for any attorney fees that she had incurred previously. Accordingly, she has forfeited the right to raise this issue on appeal. (See *LeFlore v. Grass Harp Productions, Inc.* (1997) 57 Cal.App.4th 824, 838, fn. 15 [point not raised in trial court is waived].)

## DISPOSITION

The judgment is affirmed.

---

[3] Respondents also argue that appellant cannot prove she sustained economic harm for $8,235 in double-charged premiums because they modified her loan before trial by crediting approximately $17,000 to her escrow account. In light of our conclusions, we do not consider this point.

_____

Sanchez, J.

WE CONCUR:

_____

Humes, P. J.

_____

Banke, J.

*A156526  Jewell v. Barclays Capital Real Estate, Inc. et al.*

12